UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:

|  |  |
|---|---|
|  | Chapter 11 |
| GALLANT CAPITAL MARKETS, LTD., | Case No. 17-41814-ESS |
| Debtor. |  |

-------------------------------------------------------------x
ESTHER DUVAL, AS CHAPTER 11 TRUSTEE
OF GALLANT CAPITAL MARKETS, LTD.
ESTATE,

|  |  |
|---|---|
| Plaintiff, | Adv. Proc. No. 18-01038-ESS |
| vs. |  |
| AFX CAPITAL MARKETS LTD., AFX CAPITAL U.S. CORP. and STO SUPER TRADING ONLINE, |  |
| Defendants. |  |

-------------------------------------------------------------x

## FIRST AMENDED COMPLAINT

Esther DuVal, as the Chapter 11 Trustee (the "Trustee" or "Plaintiff") of the jointly-administered estates of Avenica, Inc. ("Avenica") and Gallant Capital Markets, Ltd. ("Gallant" along with Avenica are collectively referred to as the "Debtors"), on behalf of the Gallant estate, brings this First Amended Complaint to turnover $2.85 million and for other relief against defendants AFX Capital Markets Ltd. ("AFX Capital Markets"), AFX Capital U.S. Corp. ("AFX Capital U.S.", along with AFX Capital Markets are collectively referred to as "AFX") and STO Super Trading Online ("STO", along with AFX are collectively referred to as "AFX Defendants").

## NATURE OF THE PROCEEDING

1.      This adversary proceeding is brought to recover sums due the Debtors by AFX Defendants or to avoid and recover transfers made by Gallant to AFX Defendants or funds improperly withheld by AFX Defendants and which is due to Gallant under §§ 105(a), 362, 541, 542, 547, 548, 550 and 551 of Title 11 of the United States Code (the "Bankruptcy Code"), Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and 28 U.S.C. § 2201 and to hold AFX Defendants liable for, among other things, failure to turnover property of Gallant's estate and a violation of the automatic stay.

## JURISDICTION AND VENUE

2.      Since this action arises under the Debtors' pending Chapter 11 bankruptcy cases, the United States Bankruptcy Court for the Eastern District of New York (the "Court") has jurisdiction over this action under 28 U.S.C. §§ 157(a) and 1334(b) and Bankruptcy Rules 6009 and 7001.

3.      The statutory predicates for the claims asserted herein are Bankruptcy Code §§ 362, 541, 542, 547, 548, 550 and 551, Bankruptcy Rules 6009 and 7001, 28 U.S.C. § 2201.

4.      This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1), (b)(2)(A), (b)(2)(B), (b)(2)(E), (b)(2)(F), (b)(2)(H) and (b)(2)(O).

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

6.      At all times relevant, the Debtors and one or more of AFX Defendants were engaged in business transactions including, *inter alia*, making wire transfers to accounts based in the United States, exchanging contracts and other business-related transactional documents over the internet and conducting business transactions over telecommunications systems.

7.    At all times relevant, one or more of AFX Defendants, through appointed representatives, were present in the United States, either physically, directly, or indirectly for, *inter alia*, the purpose of transacting business.

8.    One or more of AFX Defendants had an office location in the United States and advertised, marketed and engaged in at least one press release about its office in New York.

9.    At all times relevant, one or more of AFX Defendants had its employees and/or representatives solicit business for its U.S. operations.

10.    At all times relevant, upon information and belief, one or more of AFX Defendants had its employee(s) and/or representatives participate in trade shows related to business products, education and training.

11.    One or more of AFX Defendants engaged in press releases about its New York City office and looked to attract business through U.S. marketing and operations.

12.    At all times relevant, AFX Defendants maintained an employee and an office in New York to conduct business.

13.    At all times relevant, one or more of AFX Defendants had its overseas representatives visit New York several times per year to discuss the New York business and meet with the employee(s) and staff.

14.    At all times relevant, one or more of AFX Defendants processed payroll in New York in connection with its employee(s).

15.    At all times relevant, one or more of AFX Defendants maintained a banking account at Bank of America in New York to process payroll.

16.     AFX Defendants conducted business over the internet and/or telecommunication systems with one or both of the Debtors, who were located in the United States including, but not limited to, New York.

17.     AFX Defendants exchanged documents over the internet with one or more of the Debtors, who were located in the United States including, but not limited to, New York.

18.     AFX Defendants entered into contracts with the Debtors knowing the Debtors had business operations directly or indirectly in the United States.

19.     One or more of AFX Defendants conducted business through a U.S. employee and or representative, in person and in New York, with one or both of the Debtors.

**A.    AFX Defendants Expanded Operations
In The United States And Hired Thomas O'Reilly**

20.     In or about 2015, Defendant AFX Capital Markets sought to further expand business operations in the United States.  This expansion occurred through, among other things, the deliberate hiring of a senior vice president, updating its New York office location, updating its website and marketing its telephone number.

21.     Through deliberate steps taken, Defendant AFX Capital Markets attempted to further stabilize its brand name and presence in the United States.

22.     To aid with the above further expansion into the United States, AFX Capital Markets opened a new entity called AFX Capital U.S.

23.     AFX Capital U.S. is a New York corporation established in 2015 authorized to do business in the United States and, at all times relevant, had an office location in New York City.

24.     AFX Capital U.S. is owned in part by Manuela Mazzacco (50%) and, upon information and belief, by AFX Capital Markets (50%).

4

25.     AFX Capital U.S. was merely established as a payroll processing conduit of AFX Capital Markets.

26.     Upon information and belief, AFX Capital Markets provided all initial capital for AFX Capital U.S., and any time there were shortfalls in payroll or expenses, would fund the shortfall.

27.     At all times relevant, Thomas O'Reilly ("O'Reilly") was the former Senior Vice President of Sales ("SVPS") for AFX Capital U.S.

28.     O'Reilly served as SVPS for AFX Defendants from September 2015 through on or about April 2017.  During that time, O'Reilly was based in New York and occupied an office leased by AFX Capital Markets at 370 Lexington Avenue, Office 2001, New York, NY (the "New York Office").

29.     The New York Office was used as a presence for AFX Defendants to attract business.

30.     In setting up an office, hiring personnel, developing a website and having a telephone number, AFX Defendants intended to do business in the United States and attract and solicit clients through business activities in the United States.

31.     At all times relevant, by establishing its contacts in the United States, it was foreseeable to AFX Defendants to be subject to jurisdiction in New York.

32.     In the course of his work for AFX, O'Reilly typically referred to the company as AFX, but AFX also used "STO" and "SuperTradingOnline" as tradenames.

33.     At all times relevant, STO is a trading name of, and has a direct business relationship with AFX Capital Markets.

34.     At all times relevant, STO maintained an office at 370 Lexington Avenue, Office 2001, New York, New York 10017.

35.     At all times relevant, STO maintained an office at Lexington Avenue on behalf of AFX Capital Markets and represented to the general public and marketed that it was a division of AFX Group, which upon information and belief, owns AFX Capital Markets.

36.     Upon information and belief, AFX Defendants utilized the office located on Lexington Avenue in order to attract customers through business activities in the United States and to establish a more global presence.

37.     O'Reilly worked as a salesman in the finance industry for approximately forty (40) years mostly in the interbank market. However, during the latter part of his career, O'Reilly worked in the retail foreign exchange market for companies like AFX Defendants.

38.     Prior to working as the SVPS of AFX Capital U.S. in 2015, O'Reilly was employed in New York as SVPS for FXDD Global, a company who also, provides a foreign currency exchange trading platform.

39.     Upon information and belief, based upon O'Reilly's experience in New York and in foreign currency exchange, AFX Defendants sought him to run their operations.

40.     On or about the spring of 2015, O'Reilly was approached by Mario Persichino, the owner and/or shareholder of AFX Capital Markets, regarding working for AFX in a sales capacity. Apparently, O'Reilly had previously met Mario Persichino and had come across him several times through the years at trade shows or other events involving the foreign currency exchange business.

41.     By specifically seeking out O'Reilly and further establishing its New York office, AFX Defendants had to reasonably believe they would be subject to jurisdiction in New York.

42.    Mario Persichino and O'Reilly met in New York shortly prior to O'Reilly joining AFX Capital Markets to discuss his potential employment with AFX in New York.

43.    Mario Persichino sought out O'Reilly and enticed him to work for one or more of the AFX Defendants.

44.    After joining AFX Defendants, O'Reilly met with Mario Persichino during his visits to New York, which occurred approximately three (3) times per year.  Upon information and belief, Mario Persichino was in New York to oversee AFX Defendants operations in New York.

45.    While employed by AFX Defendants in New York, O'Reilly also met with Manuela Mazzacco, the Chief Executive Officer of AFX Capital Markets, when she came to New York.

46.    As a result of establishing a U.S. based operation, AFX Defendants had two (2) different high-ranking personnel oversee operations, Mario Persichino and Manuela Mazzacco.

47.    Upon information and belief, Mario Persichino has many other business interests in the United States, including in Chicago.

48.    While his role as SVPS for AFX Defendants was primarily focused on sales, O'Reilly took on other responsibilities as the New York based representative, including, but not limited to:

a)    opening an AFX U.S. bank account at Bank of America;
b)    communicating with ADP for AFX's U.S. payroll, workman's compensation and unemployment insurance needs; and
c)    issuing payments from AFX's U.S. bank account as necessary for U.S. business operations.

49.    If there were insufficient funds in AFX Capital U.S. Bank of America account to cover U.S. business operations, O'Reilly would contact AFX Capital Markets' employees overseas

and they would wire the requisite funds from their overseas accounts to AFX's U.S. bank account at Bank of America.

50.     Upon information and belief, AFX Capital US operations were entirely funded by AFX Capital Markets.  AFX Capital US did not have any separate source of revenue to fund business operations including payroll, lease obligations and insurance needs.  Instead, it was funded entirely from AFX Capital Markets overseas.

51.     Part of the growth strategy O'Reilly discussed with AFX Defendants upon joining the company included growing its New York office by bringing on additional sales staff including Japanese and other Asian language speaking staff.

52.     O'Reilly and AFX Defendants had a strategy to develop an Asian sales staff to further assist in expanding AFX business through business activity in the United States.

53.     Upon starting his work with AFX Defendants, O'Reilly was responsible for managing AFX's relationship with Gallant since its Chief Executive Officer, Salvatore Buccellato ("Buccellato"), and personnel were also located in New York. As the representative of AFX Defendants, O'Reilly's role included meeting with Buccellato, typically over meals.

54.     As a representative of AFX Defendants, O'Reilly met with AFX Defendants' business contacts, business prospects and clients in the United States.

55.     O'Reilly's other U.S. focused work for AFX Defendants was mostly of a marketing nature as opposed to sales since AFX clients could not be U.S. residents due to certain regulatory restrictions.  That is, O'Reilly sought to leverage the benefits of his network which included U.S. based introducing brokers, hedge funds, banks and liquidity providers, but with the ultimate goal of securing non-U.S. clients for AFX Defendants. For example, O'Reilly had introducing broker contacts in Massachusetts, Texas and Florida, as well as in other U.S. locations at the time, with

whom O'Reilly would network to pursue international clients; however, a growing challenge was that during this same time period introducing brokers were moving outside the U.S. due to the non-U.S. locations of clientele.

56.    With respect to directly targeting clients for AFX Defendants, most of O'Reilly's focus was on Asia based clients since he had established relationships there and the Asian retail foreign exchange market was active. A significant amount of his work involved telephone calls to Asian contacts and often at late hours to accommodate the time zone difference from New York.

57.    While O'Reilly was able to successfully open a handful of AFX Defendants accounts for Asian clients that O'Reilly worked with during his time at FXDD Global, these accounts did not amount to significant deposits or trading activity for AFX Defendants.

58.    On or about early spring 2017, O'Reilly became aware that the Debtor was seeking, and may have had a liquidity necessity to, withdraw funds from its AFX account at AFX Capital Markets. Specifically, AFX Capital Markets was not transferring the funds requested by Gallant. Upon becoming aware of this situation, as AFX Defendants' representative, O'Reilly encouraged both sides to communicate and have a direct dialogue regarding the amount due Gallant.

### B.    AFX Defendants Alert The Public About Its Presence

59.    AFX Defendants website is visible in the United States.

60.    The website is established under a platform and tradename of STO.

61.    STO is a tradename of defendant AFX Capital Markets.  In fact, its website even states it is a division of AFX Group, which, upon information and belief, owns AFX Capital Markets.

62.     Upon information and belief, AFX Defendants took steps to make it visible in the United States because AFX Defendants were attempting to attract customers through its business activities in the United States.

63.     In making its website available in the United States, AFX Capital Markets did nothing to provide a disclaimer to the public about its location or otherwise.  This purposeful step indicates a deliberate effort by AFX Defendants to promote its brand in the United States.

64.     A close review of the website identifies the United States as a location along with other locations around the world.  A copy of the website screenshot identifying "Who We Are" is annexed hereto as **Exhibit A**.

65.     AFX Defendants took affirmative and deliberate steps to engage customers in viewing the website that the entity was available and present in the United States.

66.     In furtherance of this, AFX Capital Markets directed that a press release dated October 29, 2015 (the "Press Release") be used with the letters AFX without any distinguishing characteristics showing it is a Cypress entity.

67.     In providing the content for the Press Release, AFX Defendants could have insured the public that it was a Cypriot company and did not have a real presence in the United States. Instead, AFX Defendants acted to the contrary.

68.     The Press Release provided comfort to the public and AFX Defendants' customers, of which the Debtor was one, about AFX Defendants further expansion into the United States by specifically stating, "we are delighted to have a footprint in the United States, so that we can expand our global network and strengthening relationships, with our business partners is a key part of AFX Capital's strategy". The quote was made by Manuela Mazzacco, the CEO of AFX Capital. A copy of the Press Release is annexed hereto as **Exhibit B**.

69.     Upon information and belief, AFX Defendants expansion into the United States provided a comfort level to the Debtor in its continued business relationship with AFX Defendants.

70.     Upon information and belief, the Press Release was written by AFX Defendants or the content of the Press Release was provided for by AFX Defendants.

71.     Upon information and belief, the Press Release was paid for by AFX Capital Markets.

72.     Based upon the Press Release, it was disseminated to the public at large and utilized as a way to attract additional business in the United States.

73.     The Press Release about expanding operations merely provided further comfort level to public about AFX Defendants contacts in the United States and its intent to attract customers through its business activities in the United States.

74.     Upon information and belief, AFX Capital Markets attended trade shows and paid for trade shows in the United States to further promote its brand, attract customers and be part of the greatest financial market in the world.

75.     AFX Defendants had a telephone number at its New York Office.  By doing so, it is clear that AFX Defendants intended to have contacts and communicate in the United States.

76.     Upon information and belief, AFX Capital Markets completely restructured its website after pre-litigation settlement discussions to remove all contacts with the United States. However, in its haste, AFX Defendants failed to remove any indication that they have offices in New York – now U.S. is deleted. A copy of the current map of locations is annexed hereto as **Exhibit C**.

77.     AFX Defendants were engaged in marketing and advertising in the United States and money was directed by people in the United States.

78.    AFX Defendants engaged in brand awareness in the United States.

79.    Sal Buccellato, on behalf of the Debtors, while in the United States, negotiated the terms of the Client Agreement (as defined below at para. 111) with AFX Defendants.

80.    AFX Defendants knew that Buccellato was in the United States while he was negotiating the Client Agreement.

81.    AFX Defendants knew that Buccellato had a New York office located in Queens and that the Debtor operated its business from that location and office.

82.    AFX Defendants intended to do business in the United States and therefore can be subject to jurisdiction in the United States.

83.    At all times relevant, AFX Defendants contact with the United States were so continuous and systematic as to make them part of the forum state.

84.    The money improperly taken by AFX Capital Markets implicates New York, has a substantial nexus to the creditors of these estate and should be adjudicated here.

85.    The parties injured were creditors in this case.

86.    AFX Defendants made itself available to the United States and the Debtor by, among other things, negotiating the Client Agreement, creating a website and telephone number in the United States, preparing the Press Release and alerting the public of its location in New York City.

87.    AFX Defendants have the requisite minimum contacts with the United States including, but not limited to, New York.

88.    In accordance with Local Bankruptcy Rule 7008-1, Plaintiff consents to the entry of final orders and judgment by this Court if it is determined that this Court, absent the consent of

the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

### C.    AFX Defendants Are All Alter Egos Of Each Other

89.    AFX Capital Markets and STO are one in the same entity.

90.    STO Trading is not a separate legal entity.

91.    The AFX Capital Markets website platform was marketed and branded as STO Trading and advised the public that it is a trading name of AFX Capital Markets.

92.    AFX Capital Markets runs, manages, modifies and provides all content for its website.

93.    AFX Capital Markets capitalized AFX Capital U.S. and thereafter provided all daily funding of its operations.

94.    AFX Capital Markets essentially controlled, directed and managed AFX Capital U.S.

95.    AFX Capital U.S. is the alter ego of AFX Capital Markets.

96.    The AFX Defendants are all alter egos of each other.

### THE PARTIES

97.    At all times relevant, Gallant was a provider of foreign exchange technologies and services to private and institutional traders. Gallant registered its business at 3170 Nemours Chambers Road, Tortola, British Virgin Islands, but used a mailing address as 5068 44th Street, Woodside New York 11377.

98.    At all times relevant, Gallant operated its business from its Queens location. Buccellato utilized that office location and conducted Gallant's business.

99.     At all times relevant, Avenica provided services and technical support to Gallant and had its principal places of business located at 48 Wall Street, Floor 11, New York, New York 10005 and 85 Broad Street, 16 Floor, New York, New York 10004.

100.     Salvatore Buccellato held 100% of the membership interest in Avenica and was the CEO of both Debtors.

101.     STO is a trade name of AFX Capital Markets and a division of AFX Group.

102.     Defendant AFX Capital Markets is authorized to conduct business and is "regulated by the Cypress Securities and Exchange Commission and the Financial Conduct Authority". See www.https://www.afxgroup.com/en/.

103.     AFX Capital Markets is a Cypriote limited company with an address of AFX Capital Markets is Gladstonos 116, Kyprianou House, 1st floor, 3032 Limassol, Cyprus.

104.      At all times relevant, both AFX Defendants maintained an office at 370 Lexington Avenue, Office 2001, New York, New York 10017, and continues to maintain a presence in the United States.

105.     At all times relevant, AFX Capital U.S maintained an office at 370 Lexington Avenue, Office 2001, New York, New York 10017.

106.     Upon information and belief, at all times relevant, Mario Persichino ("Persichino") is the acting Executive Director of AFX Capital Markets.

## PROCEDURAL AND FACTUAL HISTORY

### A.     The Debtor's Bankruptcy Filing

107.     On April 14, 2017 (the "Filing Date"), the Debtors each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Court.

108.     The Debtors were operating their businesses and managing their affairs as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

109.    By Order dated May 30, 2017, Esther DuVal, CPA, was appointed as the Chapter 11 Trustee of the Debtors' cases [Dkt. No. 67].

110.    By Amended Order entered on August 29, 2017, the Debtors cases are being jointly administered [Dkt. No. 145].

111.    Pursuant to Bankruptcy Code § 1108, the Trustee is authorized to operate the Debtors' businesses.

**B.    AFX Capital Markets Client Agreement with Gallant**

112.    On or about November 13, 2014, Gallant and AFX Capital Markets entered into a client account agreement entitled "Terms and Conditions for Eligible Counterparties and Professional Clients" (the "Client Agreement").

113.    The Client Agreement was negotiated by the Debtors from its office location in New York.

114.    On March 20, 2015, AFX Capital Markets and Gallant amended the Client Agreement under the terms of the AFX capital risk share agreement (the "Capital Risk Share Agreement"), in which the parties agreed to enter into a revenue sharing arrangement.

115.    The Capital Risk Share Agreement was negotiated by the Debtors from its office location in New York.

116.    Under the Capital Risk Share Agreement, Capital Revenue is determined by analyzing the amount of realized profit/loss during each calendar month in Gallant trading account(s) owed to Gallant by AFX.

117.    AFX Capital Markets and Gallant agreed that payment of AFX Revenue would be conducted on a monthly basis, with payment, if any, being made no later than 30 calendar days following the last day of the month.

**C.**    <u>**Relevant Transactional History Between Gallant and AFX Capital Markets**</u>

118.    Upon execution of the Client Agreement, an account in the name of Gallant was opened at AFX Capital Markets (the "<u>Gallant Account</u>").

119.    Since the execution of the Client Agreement, Gallant had multiple Gallant Account numbers beginning with an account number ending in 674.

120.    The last account number of the Gallant Account ended in 276.

121.    All transactions referenced herein in the year 2015 in the Gallant Account took place in account number ending in 674.

122.    All transactions referenced herein between the years 2016 and 2017 in the Gallant Account occurred in account number ending in 276.

123.    In accordance with the Client Agreement, Gallant deposited an aggregate amount of $2,349,896.12 into the Gallant Account, for its benefit, at AFX Capital Markets as follows:

    i.  $149,988.00 on April 23, 2015;

    ii.  two deposits each in the amount of $249,988.00 on June 8, 2015;

    iii.  $199,988.00 on July 2, 2015;

    iv.  $499,981.46 on November 21, 2016;

    v.  $499,981.39 on November 23, 2016; and

    vi.  $499,981.27 on December 20, 2016.

124.    On a daily basis, AFX Capital Markets emailed Gallant the same day, or prior day, trading activity and its account balance in STO AFX Daily Confirmation Reports.

125.    On March 14, 2017 (30 days prior to the Filing Date), according to the STO AFX Daily Confirmation Report emailed to Gallant by AFX Capital Markets, Gallant's account reflected a balance of 1,727,733.69.[1]

126.    The following day on March 15, 2017, according to the STO AFX Daily Confirmation Report emailed to Gallant by AFX Capital Markets, the Gallant Account reflected a balance of $2,355,378.42.[2]

127.    On March 30, 2017 (two weeks prior to the Filing Date), according to the STO AFX Daily Confirmation Report emailed to Gallant by AFX Capital Markets, the Gallant Account reflected a balance of $2,391,869.87.

**D.    Gallant's Pre-Petition Demand for Its Money**

128.    In an email dated April 3, 2017 from Buccellato, the CEO of Gallant, to Persichino, the Executive Director of AFX Capital Markets, Gallant made an initial request for a withdrawal from its Gallant Account to a separate Gallant account in the amount of $1,500,000.00 (the "April 3 2017 Demand").

129.    On the date of the April 3, 2017 Demand, according to the STO AFX Daily Confirmation Report, there was a balance of $2,472,421.41 in the Gallant Account.

130.    Defendant AFX Capital Markets never remitted the funds.

131.    On April 5, 2017, since Gallant did not receive the money, it made a second request for the withdrawal of $1,441,217.10 (the "Second Demand").

132.    On the day of the Second Demand, the Gallant Account reflected a balance of $2,472,016.28.

133.    Defendant AFX Capital Markets never remitted the funds.

---

[1]    The STO AFX Daily Confirmation Report showed a loss of $32,144.52 on March 14, 2017.
[2]    The STO AFX Daily Confirmation Report showed a profit of $627,644.73 on March 15, 2017.

134.    On April 24, 2017, Buccellato, the CEO of the Debtors executed a declaration before this Court, sworn under penalty of perjury, stating that "Gallant has sustained substantial financial difficulty due to the unforeseen actions of its main counter-party, AFX Capital Markets, a company registered with the Cyprus Securities and Exchange Commission. That unforeseen counter-party's actions have resulted in significant default on obligations owed to Gallant and has had the effect of restricting Gallant's ability to trade and do business. Furthermore, this counterparty default resulted in material financial difficulties that triggered Gallant's insolvency on or around 14 April 2017. Specifically, AFX has failed to process a redemption request submitted by Gallant in excess of USD 2,000,000. Gallant's redemption request was entirely ignored by AFX despite numerous written and verbal requests. In addition to this counterparty default, which was in fact Gallant's primary and most important counterparty, Gallant was unable to provide liquidity services to its own clients.  As a result, to protect its assets including customer accounts, Gallant ceased trading at 17:00 hours on 14 April 2017 and filed for chapter protection immediately thereafter". See Case No. 17-41814, ECF Docket No. 40, pp, 2-3.

## E.    Trustee's Investigation Reveals Unauthorized Transfers by AFX from Gallant Account

135.    Based upon the Trustee's review of the Debtors' records, several unauthorized transfers by AFX Capital Markets of Gallant's property has come to light. On April 6, 2017 (8 days from the Filing Date), AFX Capital Markets, without authorization, made 4 withdrawals (the "Withdrawals") from the Gallant Account as follows:

    i)    $114,554.20, purportedly representing 50% of Gallant's positive profit/loss (negative AFX revenue calculation) for January, 2017;

    ii)    $530,442.80, purportedly representing 50% of Gallant's positive profit/loss (negative AFX revenue calculation) for February, 2017;

iii)    $381,745.20, purportedly representing 50% of Gallant's positive profit/loss (negative AFX revenue calculation) for March, 2017; and

iv)    $2,024.20, purportedly representing 50% of Gallant's positive profit/loss (negative AFX revenue calculation) for April, 2017.

136.    The Withdrawals total $1,028,766.40, which purportedly represented four months of positive profit/loss owed by Gallant to AFX Capital Markets under the Capital Risk Share Agreement.

137.    Based on the Trustee's investigation to date, Gallant was never provided with a detailed analysis of the profit sharing for these four months.

138.    After the Withdrawals, according to the STO AFX Daily Confirmation Report dated April 6, 2017, the Gallant Account reflected a balance of $1,443,132.92.

139.    In an email dated April 10, 2017, Gallant informed defendant AFX Capital Markets that it did not receive the wire transfer requested twice the week before, and made a third request for, the withdrawal of the funds and demanded that the wire be initiated within 24 hours (the "Third Demand").

140.    In April 2017, Gallant was also communicating with Thomas O'Reilly, an AFX Capital U.S. employee in New York about Gallant's demands for its funds in the Gallant Account. Unfortunately, those communications did not result in defendant AFX Capital Markets complying with Gallant's numerous demands.

141.    On April 13, 2017 at 5:00 p.m. (EST), Gallant stopped all foreign transaction activity with defendant AFX Capital Markets.

142.    On April 14, 2017, the Filing Date, according to the STO AFX Daily Confirmation Report, AFX Capital Markets, again without authorization, withdrew the remaining balance of Gallant's funds from the Gallant Account in the amount of $1,443,132.92 (the "Remaining

Balance" along with the Withdrawals are collectively defined as the "Gallant Funds"), leaving a balance of $0.00.

**F.    Post-Petition Demands by the Trustee for AFX To Return the Gallant Funds**

143.    Upon the appointment of the Trustee, an immediate demand was made for the turnover of Gallant Funds.

144.    Specifically, in a letter dated June 12, 2017, the Trustee, through her special litigation counsel, demanded the immediate turnover of the Gallant Funds totaling $2,471,893.40 as it is property of Gallant's estate.

145.    In a letter dated June 27, 2017, AFX Capital Markets, through counsel, responded to the demand and asserted defenses, but failed to turn over the Gallant Funds.

146.    In a letter dated July 17, 2017, the Trustee, through her special litigation counsel, disputed the arguments raised by AFX Capital Markets in the June 27th letter and made a second demand for the return of the funds.  Defendant AFX Capital Markets refused to turn over the funds.

147.    Based on the Trustee's calculation and analysis, AFX Defendants owe the Gallant estate an additional $383,926.65 based upon a miscalculation of the revenue sharing arrangement (the "Additional Money").

148.    The Additional Money owed is calculated utilizing the Capital Risk Share Agreement and their course of conduct.

149.    The Additional Money owed is property of the Gallant estate.

150.    AFX Defendants owe the Additional Money to Gallant.

### FIRST CLAIM FOR RELIEF AGAINST ALL AFX DEFENDANTS
**(Turnover of Property of the Estate - §§ 541 and 542)**

151.    Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "150" as if set forth fully herein.

152.    Gallant had legal and equitable interests in: (a) the Withdrawals in the amount of $1,028,766.40; (b) the Remaining Balance in the amount of $1,443,132.92; and (c) the Additional Money in the amount of $383,926.65 for an aggregate amount of $2,855,815.97.

153.    The Gallant Funds are property of the Gallant estate.

154.    The Additional Money are property of the Gallant estate.

155.    By reason of the foregoing, Plaintiff is entitled to the entry of an Order and judgment against AFX Defendants, jointly and severally, under Bankruptcy Code §§ 541 and 542: (a) in an amount to be determined at trial but in no event believed to be  less than $2,471,899.32, plus the Additional Money in the amount of $383,926.65; (b) directing the immediate turnover of Gallant Funds in the amount of $2,471,899.32 by AFX Defendants, plus the Additional Money in the amount of $383,926.65; (c) attorney's fees and costs in connection with this action for AFX Defendants intentional withholding of the Plaintiff's money, and (d) for a full and complete accounting of the Gallant Funds and Additional Money.

## SECOND CLAIM FOR RELIEF AGAINST ALL AFX DEFENDANTS
### (Declaratory Relief - 28 U.S.C. § 2201(a))

156.    Plaintiff repeats and re-alleges the allegations set forth in paragraphs "1" through "155" as if set forth fully herein.

157.    Gallant has a legal and equitable interest in the Gallant Funds, whether previously distributed or to be distributed in the future.

158.    Gallant's legal and equitable interest in the Gallant Funds, whether previously distributed or to be distributed in the future, is property of the Gallant estate.

159.    The Gallant Funds were in the Gallant Account.

160.    AFX Defendants improperly transferred the Gallant Funds and have failed to account for the Gallant Funds.

161.    By reason of the foregoing, and in accordance with 28 U.S.C. § 2201(a), Plaintiff is entitled to a declaration that the Gallant Funds, whether previously distributed or to be distributed in the future, are property of the Gallant estate pursuant to Bankruptcy Code § 541(a), and an order and judgment directing that the Gallant Funds be turned over to the Trustee for the benefit of creditors, along with attorney's fees and costs in connection with AFX Defendants intentional withholding of the Plaintiff's money.

### THIRD CLAIM FOR RELIEF AGAINST ALL AFX DEFENDANTS
### (Preference - § 547)

162.    The Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "161" as if set forth fully herein.

163.    The removal of the Withdrawals and the Remaining Balances from the Gallant Account was made within ninety (90) days of the Filing Date.

164.    Upon information and belief, the removal of the Withdrawals and the Remaining Balances from the Gallant Account was made to, or for the benefit of, AFX Defendants.

165.    The removal of the Withdrawals and the Remaining Balances from the Gallant Account was made to, or for the benefit of, AFX Defendants because upon information and belief, the Withdrawals and the Remaining Balances reduced or satisfied a debt owed by Gallant to AFX Defendants.

166.    Upon information and belief, the removal of the Withdrawals and the Remaining Balances from Gallant Account was made on account of an antecedent debt owed by Gallant to AFX Defendants.

167.    Upon information and belief, the removal of the Withdrawals and the Remaining Balances from Gallant's account was made on account of antecedent debt owed by Gallant to AFX Defendants based upon the business transactions and history between Gallants and AFX

Defendants, whereby (a) AFX Defendants would supplied services to Gallant, (b) AFX Defendants would deliver a bill or an invoice to Gallant for such services, and (c) Gallant was required to remit payment to AFX Defendants for such services on a subsequent date.

168.    The removal of the Withdrawals and the Remaining Balance from the Gallant Account was made while Gallant was insolvent or Gallant was rendered insolvent as a result thereof.

169.    The removal of the Withdrawals and the Remaining Balance from Gallant Account enabled AFX Defendants to receive more than they would have otherwise received: (a) in Gallant's chapter 7 bankruptcy case; (b) if the Withdrawals and the Remaining Balance were not removed; and (c) if AFX Defendants received payment to the extent provided by the provisions of the Bankruptcy Code.

170.    As evidenced by the current claims filed in this case and the debt incurred to date, the liabilities of Gallant's estate exceed $1,951,496.49 and no bar date has been established in the Debtors' cases as of the date of this complaint.

171.    By reason of the foregoing, the removal of the Withdrawals and the Remaining Balance from the Gallant Account is avoidable and recoverable by the Trustee under Bankruptcy Code §§ 547(b) and 550.

172.    By reason of the foregoing, the Trustee is entitled to an order and judgment: (i) avoiding the removal of the Withdrawals and the Remaining Balance from the Gallant Account; or (ii) a money judgment in an amount to be determined at trial but in no event believed to be less than $2,471,899.32, plus interest thereon, attorneys' fees and costs.

## FOURTH CLAIM FOR RELIEF AGAINST ALL AFX DEFENDANTS
### (Fraudulent Conveyance - § 548(a))

173.    Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "172" as if set forth fully herein.

174.    AFX Defendant's withdrawal of the Remaining Balance from the Gallant Account was made with the actual intent to hinder, delay or defraud present or future creditors in violation of Bankruptcy Code § 548(a)(1)(A).

175.    The withdrawal of the Remaining Balance constitutes a fraudulent conveyance of Gallant's assets in violation of Bankruptcy Code § 548(a)(1)(A).

176.    By reason of the foregoing, Plaintiff is entitled to judgment against the AFX Defendants: (a) avoiding the withdrawal of the Remaining Balance from the Galant Account; and (ii) a money judgment in an amount to be determined at trial but in no event believed to be less than $1,443,132.92, plus interest thereon, attorneys' fees and costs.

## FIFTH CLAIM FOR RELIEF AGAINST ALL AFX DEFENDANTS
### (Fraudulent Conveyance - § 548(b))

177.    Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "176" as if set forth fully herein.

178.    AFX Defendant's withdrawal of the Remaining Balance from the Gallant Account occurred on or before the Filing Date.

179.    Upon information and belief, Gallant received less than reasonably equivalent value in exchange for the withdrawal of the Remaining Balance from the Gallant Account.

180.    Upon information and belief, Gallant: (a) was insolvent on the date of the withdrawal of the Remaining Balance or became insolvent as a result of these events; (b) was engaged in business or a transaction, or were about to engage in business or a transaction, for

which any property remaining with Gallant was unreasonably small capital; or (c) intended to incur or believed that it would incur, debts that would be beyond its ability to pay as they matured.

181.    The withdrawal of the Remaining Balance by AFX Defendants from the Gallant Account constitutes a fraudulent conveyance under Bankruptcy Code § 548(a)(1)(B).

182.    The withdrawal of the Remaining Balance from the Gallant Account was made to or for the benefit of AFX Defendants.

183.    By reason of the foregoing, the Trustee is entitled to an order and judgment: (i) avoiding the withdrawal of the Remaining Balance from the Gallant Account; or (ii) a money judgment in an amount to be determined at trial but in no event believed to be less than $1,443,132.92, plus interest thereon, attorneys' fees and costs.

### SIXTH CLAIM FOR RELIEF AGAINST ALL AFX DEFENDANTS
**(Violation of the Automatic Stay - §§ 105(a) and 362)**

184.    The Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "183" as if set forth fully herein.

185.    Upon information and belief, AFX Defendants withdrew the Remaining Balance from the Gallant Account on or after the Filing Date.

186.    AFX Defendants violated the automatic stay by withdrawing the Remaining Balance of $1,443,132.92.

187.    Upon information and belief, AFX Defendants knew, or should have known, that the Debtors filed for bankruptcy relief.

188.     AFX Defendants' violation of the automatic stay has injured Plaintiff, on behalf of the Debtors' estates, in an amount to be determined at trial, but in no event believed to be less than $1,443,132.92.

189.    By reason of the foregoing, Plaintiff is entitled to the entry of an order and judgment, under Bankruptcy Code § 105(a) and 362, against AFX Defendants for damages in an amount to be determined at trial, but in no event believed to be less than $1,443,132.92, plus attorney's fees and costs.

## SEVENTH CLAIM FOR RELIEF AGAINST ALL AFX DEFENDANTS
### (Declaratory Judgment – 28 U.S.C. § 2201)

190.    Plaintiff repeats and realleges the allegations set forth in paragraphs "1" through "189" as if set forth fully herein.

191.    At all times relevant, AFX Capital U.S. was dominated and controlled by AFX Capital Markets.

192.    Upon information and belief, AFX Capital Markets was the 50% shareholder of AFX Capital U.S.

193.    Upon information and belief, AFX Capital Markets capitalized AFX Capital U.S. and fully funded its daily operations.

194.    The AFX Defendants shared common office space on Lexington Avenue, New York as well as the same telephone number at the Lexington Avenue location.

195.    The AFX Defendants shared the same website and benefitted from the same Press Release.

196.    In the Press Release, the AFX Defendants did nothing to separate their existence to the public.

197.    By virtue of the domination and control over AFX Capital U.S., AFX Capital Markets misused AFX Capital U.S., the purpose of which was to hinder, delay and defraud its creditors.

198.     Accordingly, under 28 U.S.C. § 2201, Plaintiff is entitled to a judicial declaration that: (a) AFX Capital U.S. is the alter ago of AFX Capital Markets; and (b) that AFX Capital Markets dominated AFX Capital U.S. and used its property, whether real and personal, wherever situated, as if it were its own and asserted a legal and equitable interest in the AFX Capital U.S. property.

## <u>PRESERVATION OF CLAIMS</u>

199.     Plaintiff's investigation is continuing and therefore Plaintiff reserves her right to amend this complaint to state further claims and damages against any and all appropriate parties.

**WHEREFORE**, the Trustee demands judgment on her claims for relief against AFX Defendants as follows:

1.     On the first claim for relief, against AFX Defendants, under Bankruptcy Code §§ 541 and 542: (a) in an amount as yet undetermined, but in no event less than $2,471,899.32, plus the Additional Money in the amount of $383,926.65; (b) directing the immediate turnover of $2,471,899.32 by AFX Defendants, plus the Additional Money in the amount of $383,926.65; and (c) for a full and complete accounting of his use of these funds;

2.     On the second claim for relief, against AFX Defendants, for declaratory relief that the Gallant Funds are property of the Gallant estate pursuant to Bankruptcy Code § 541(a);

3.     On the third claim for relief, against AFX Defendants, under Bankruptcy Code § 547 in an amount no less than $2,471,899.32, or such other amount as may be determined by the Court;

4.     On the fourth claim for relief, against AFX Defendants, under Bankruptcy Code § 548(a) in an amount no less than $1,443,132.92, or such other amount as may be determined by the Court;

5.     On the fifth claim for relief, against AFX Defendants, under Bankruptcy Code § 548(b) in an amount no less than $1,443,132.92, or such other amount as may be determined by the Court;

6.     On the sixth claim for relief, against AFX Defendants, under Bankruptcy Code §§ 105(a) and 362, in an amount no less than $1,443,132.92 or such other amount as may be determined by the Court;

7.      On the seventh claim for relief, under 28 U.S.C. § 2201, Plaintiff is entitled to a judicial declaration that: (a) AFX Capital U.S. is the alter ago of AFX Capital Markets; and (b) that AFX Capital Markets dominated AFX Capital U.S. and used its property, whether real and personal, wherever situated, as if it were its own and asserted a legal and equitable interest in the AFX Capital U.S. property; and

8.      For such other and further relief as the Court deems just and proper.

Dated: September 7, 2018
      Wantagh, New York

                        Respectfully submitted,

                        **LAMONICA HERBST & MANISCALCO, LLP**
                        *General Counsel to Esther DuVal,*
                        *Chapter 11 Trustee*

By:    *s/ Joseph S. Maniscalco*
           Joseph S. Maniscalco, Esq.
           Jacqulyn S. Loftin, Esq.
           3305 Jerusalem Avenue, Suite 201
           Wantagh, New York 11793